**L. B. BAILEY**

v.

**HARDWARE MUTUAL CASUALTY COMPANY.**

Civ. A. No. 14437.

United States District Court,
W. D. Louisiana,
Lake Charles Division.

Sept. 25, 1969.

Mitchel M. Evans, DeRidder, La., for plaintiff.

Davidson, Meaux, Onebane & Donohoe, Lafayette, La., for defendant.

EDWIN F. HUNTER, Jr., District Judge:

This diversity action is based on an insurance company's alleged bad faith and for negligence in failing to settle a personal injury claim within the limits of an insured's automobile liability insurance policy. Counsel agree that this case should be submitted on the record and that neither has any further evidence to offer.

We proceed to set forth findings and conclusions.

## FINDINGS OF FACT

1. On April 30, 1968, at approximately 8:55 P.M., an accident occurred in Lake Charles, Louisiana, between a vehicle owned by L. B. Bailey and being driven by his minor son, Lionel W. Bai-

ley, and a vehicle being driven by Robert L. Slaughter.

2. A policy of automobile liability insurance which had been issued by Hardware Mutual Casualty Company to Bailey Motor Company afforded coverage to Mr. Bailey with a limit of $50,000. Commercial Union Insurance Company of New York had issued a policy with a limit of $5,000 covering a vehicle belonging to Mr. Bailey's wife, Helen Bailey, which, although not involved in the accident, had been earlier driven to Lake Charles by the son, Lionel W. Bailey, and as to which questions of coverage were presented.

3. Suit was filed against Bailey by Slaughter on May 31, 1968, requesting a trial by jury and seeking damages in the sum of $293,000.

4. On or about July 20, 1968, issue was joined by an answer filed on behalf of L. B. Bailey by Thomas W. Sanders of the firm of Plauche and Plauche who had been retained by the insurer, Hardware Mutual Casualty Company, to handle the defense.

5. Mr. Bailey was advised formally that the suit exceeded the limits of his policy with Hardware Mutual.

6. On or about September 19, 1968, he retained the services of Mr. Mitchel M. Evans, attorney at law, to represent him individually in the defense of the lawsuit.

7. On September 23, 1968, Mr. Sanders furnished copies of the pleadings, interrogatories and medical reports to Mr. Evans.

8. On October 2, 1968, Mr. Sanders, as attorney for Hardware Mutual, had an extended office conference with Mr. Bailey and his son, at which time Mr. Bailey was again apprised of the fact that the plaintiff's demand in his petition created the possibility of an excess judgment.

9. On October 8, 1968, Slaughter's attorney, Russell T. Tritico, posted a letter to Mr. Sanders offering to settle all claims in the lawsuit for the sum of $55,000.

10. The insurer, Hardware Mutual, was advised by Mr. Sanders of the receipt of the letter of October 8th in a telephone conversation on October 11, 1968.

11. In order to make an up-to-date evaluation of the medical so as to evaluate the offer, Sanders promptly scheduled the discovery deposition of Slaughter's physician, Dr. Edward A. Phillips, Jr., for October 14, 1968, at 4:30 P.M. On the same date, October 11, 1968, Mr. Evans was advised that the deposition of Dr. Phillips had been scheduled and was told that the deposition was being taken in order to determine what response should be made to Mr. Tritico's offer of settlement.

12. This deposition was not taken because Mr. Tritico called Mr. Sanders and advised that his schedule would not permit him to attend the deposition of Dr. Phillips on October 14th. Thereupon Mr. Sanders arranged for and had an extended office conference with Dr. Phillips on October 14, 1968.

13. On Tuesday, October 15, 1968, Mr. Sanders conferred with representatives of Hardware Mutual and discussed the opinion of Dr. Phillips. Later the same day Hardware Mutual advised Mr. Sanders that he was authorized to pay the policy limit of $50,000 if the claim could not be settled for a lesser sum.

14. The fact that this authority was extended by Hardware Mutual was reported by Mr. Sanders to Mr. Evans in a telephone conference on the same day. Mr. Sanders attempted on several occasions to contact Mr. Tritico on October 15, 1968, but was unable to do so for the reason that Attorney Tritico was not in his office.

15. Thereafter, on October 16, 1968, Mr. Sanders was involved in the trial of a case in Lake Charles after which he returned to his office at approximately 5:00 P.M. and placed a call to Mr. Tritico but was told by Attorney Tritico's secretary that he was not in the office at the time.

16. Thereupon, Attorney Sanders stated to her that he was formally offering $50,000 in full settlement of the lawsuit and asked that Mr. Tritico be so advised. He estimates that this conversation took place at approximately 5:05 P.M. on that date.

17. At approximately 5:15 P.M., Mr. Sanders received a call from Western Union reporting a telegram from Mr. Tritico that the offer had been "withdrawn since no offer was made."

18. Thereafter, at 5:35 P.M., Mr. Sanders telegraphed Mr. Tritico that the insurer agreed to pay its policy limits of $50,000 to settle the claim of Mr. Slaughter.

19. On October 21, 1968, by letter of that date, Mr. Tritico was unconditionally offered the sum of $50,000 in settlement of all claims of Mr. Slaughter arising out of the accident.

20. On October 29, 1968, another attempt was made to conclude the matter by amicable settlement for $50,000 by forwarding to Mr. Tritico a check in that amount.

21. An exception of res judicata which was filed on behalf of Mr. Bailey was heard on October 31, 1968, and at that hearing Mr. Tritico, in testifying about the plaintiff's settlement offer, acknowledged that the *only* offer made to Mr. Sanders was that contained in his letter of October 8th.

22. On November 1, 1968, in a telephone conference between Mr. Evans and Mr. Sanders it was determined that the insured, Mr. Bailey, did not wish to make any contribution toward settlement in excess of the policy limits. At that time and at the time of a conference after the hearing on the exception, on October 31, 1968, Mr. Sanders was informed by Mr. Evans *for the first time* of a conversation which took place between Mr. Tritico and Mr. Evans on the morning of October 16, 1968, wherein Mr. Tritico had advised Mr. Evans that although he had made an offer to settle for the sum of $55,000 in his letter of October 8, 1968, in fact he would be willing to accept the sum of $50,000 in settlement provided he was shown that no coverage was afforded by the Commercial Union Insurance Company policy.

23. This offer was never communicated to Mr. Sanders at any time before the "deadline" on October 16, 1968, set by plaintiff's counsel, or, in fact, before the post-hearing conference on October 31, 1968.

24. After the foregoing various attempts to settle the case and the rejection of the unconditional offer of the full policy limits of $50,000 by Hardware Mutual, the case was tried and resulted in a verdict for the plaintiff for the sum of $75,000.

25. Subsequently, Hardware Mutual paid its policy limits of $50,000 in addition to the interest and costs and obtained a partial release and satisfaction.

26. Thereafter, the present action was instituted by the assured, Bailey, to recover the $25,000 excess judgment.

## DISCUSSION AND THE LAW

The only offer made by plaintiff's attorney, on October 8, 1968, is set forth in the letter of that date which provides as follows:

"Dear Tom:

"My client has agreed to accept the $55,000 in settlement of all of his claims and will release your assured from further responsibility. Out of the settlement, we will pay the compensation carrier. This offer is made with the understanding that Mr. Bailey has insurance with the company you represent totalling $50,000, and an additional $5,000 (excess) with Commercial Union Insurance Company.

"Since this case is scheduled for trial in approximately the next three weeks, our offer to settle on this basis will be withdrawn at 5:00 P.M., October 16; thereafter, our offer will be $75,000.00 to settle.

"Since you do not represent the excess carrier I am sending a copy of this

letter to Mr. Bailey's attorney, so that he may take whatever steps he deems appropriate.

Yours truly,

Russell T. Tritico"

In response to questioning by Mr. Evans, who was participating on behalf of Mr. Bailey individually, Mr. Tritico affirmed that the only offer that he ever made was as follows, by deposition:

"A. The original demand and the only demand that I ever made by letter or verbally, to my knowledge, before the 16th, was the fifty-five thousand dollar offer. I was under the impression that there was a total of fifty-five thousand dollars-worth of coverage. On Wednesday morning you told me that you didn't think that the other five would be available and I told you I would accept the fifty providing the other policy did not have coverage."

The foregoing testimony combined with the testimony that Mr. Tritico gave on October 31, 1968, in response to questions, is an unqualified admission that the only offer which was ever conveyed to Mr. Sanders or any other representative of Hardware Mutual Casualty Company was the offer contained in the letter of October 8, 1968, which offer was in the sum of $55,000. Mr. Tritico testified:

"Q. Mr. Tritico, since that first sentence says: 'My client has agreed to accept $55,000.00 in settlement of all his claims and will release your assured from further responsibility,' you never have offered to settle all of his claims within the policy limits of Hardware Mutual Casualty Company for which you would release from all further liability Mr. L. B. Bailey, have you?

A. I don't get your question.

Q. This offer is in the amount of fifty-five thousand dollars and we—upon receipt of that apparently you will release our in-

sured—our assured. Then there was no offer to settle all of the claims in exchange for a release for fifty thousand dollars, the policy limits of Hardware Mutual Casualty Company?

A. There would have been had the offer that I presented to your company been—

Q. Mr. Tritico, we're not talking about other offers that you may have made, we're talking about this offer—

A. That's the offer I made.

Q. October the 8th. This offer asks for fifty-five thousand dollars in settlement, doesn't it?

A. Yes, sir, it does.

Q. Then you never have offered to settle this case for fifty thousand dollars, have you?

A. I have never offered to settle this case for fifty thousand dollars to your firm, period, Mr. Hebert. * * *"

This testimony, which was given by plaintiff's original attorney, the only person in a position to know the exact settlement offer which may have been made, reveals that there was never an offer to settle this case within the policy limits of $50,000 which was ever communicated to Hardware Mutual or its representatives. The only mention of settlement for that figure was apparently made in a telephone conversation with Mr. Evans, attorney for Bailey, on the morning of October 16th, and even that was made conditional upon a determination by Mr. Tritico of the fact that another outstanding policy afforded no coverage. This conversation was not reported to Mr. Sanders or any other representative of Hardware Mutual until after the "deadline" had expired and after Hardware Mutual had tendered to plaintiff its full policy limits.

Even if there was an offer to settle within the policy limits of $50,000

which was made to the insured while the only offer made to the insurer was in the sum of $55,000, the insured had the obligation to convey the lower offer to the insurer and to insist that the case be settled at that figure. This was not done. The insurance carrier cannot be made responsible to the insured for an excess judgment for failing to offer its policy limits when it had no knowledge that the suit could be settled for that amount and when the insured himself did not convey to the insurer knowledge which he had of such possibility.

A necessary prerequisite to the imposition of liability on an insurer for an excess judgment is that the insurer failed to settle the case within the policy limits when, under the circumstances, it could and should have done so. On the record at no time was an offer to settle for $50,000 ever transmitted to the insurer or its attorney within the time delay insisted upon. Even if the offer is construed as an offer to settle all claims for $50,000, the tenders of the policy limit made by defendant on several occasions preclude liability. The offer by plaintiff's attorney contained in the letter of October 8, 1968 was received by Mr. Sanders on October 9th, which date was a Wednesday. Mr. Sanders served notice of his intention to take the deposition of Dr. Phillips in order to obtain an opinion on the current medical condition of the plaintiff. The deposition could not be scheduled until Monday, October 14, at 4:30 P.M. The weekend of October 12th and 13th intervened. On October 15, 1968 Mr. Sanders tried to contact the plaintiff's attorney on several occasions but was informed that Mr. Tritico was out of the office. On the 16th, Mr. Sanders was involved in a jury trial but immediately upon his return from the courthouse he called plaintiff's counsel. Upon being told that Mr. Tritico was not in the office, he dictated to Mr. Tritico's secretary that Hardware Mutual would pay its policy limits of $50,000 in full settlement of the claim. The time of the call was perhaps a very few minutes after 5:00 P.M., possibly 5:05 P.M.

That Hardware Mutual's counsel moved with dispatch after receiving the settlement offer cannot be doubted. Within a week after he received the offer, he informed Hardware Mutual, arranged an interview with Slaughter's doctor, reported the doctor's findings, discussed the findings with Mr. Bailey's attorney and then with Hardware Mutual, and then received settlement authority and transmitted it to Slaughter's counsel. This certainly cannot be construed as bad faith and/or negligence on the part of Hardware Mutual.

In order to recover against the insurer for an excess judgment the insured must show that the insurer acted in bad faith in the defense of the litigation. In Hernandez v. Employers Mutual Liability Insurance Company, 346 F.2d 154 (5th Cir., 1965) the Fifth Circuit had reviewed a decision of this Court in which a claim was made for an excess judgment of $100,416.92. Regarding the issue of bad faith, this Court instructed the jury as follows:

"Now, what is bad faith? Bad faith embraces more than poor judgment or negligence, it imports a conscious wrong doing, a breach of a duty through some ulterior motive. In considering whether or not an insurer acts in good faith or bad faith to its assured, you should bear in mind that the insurer may properly give consideration to its own interests and must also give equal consideration to the interests of its insured. One acts in good faith if he acts honestly and according to his best judgment, but one acts in bad faith if he uses his authority to save himself from loss in total disregard to his insured's rights. In its simplest form, bad faith means a breach of faith and a willful failure to respond to plain obligations. Bad faith is never presumed, bad faith must be proven."

In affirming the jury's decision, the Court of Appeal observed that, read as a

whole, the charge was a correct statement of Louisiana Law.

■ When one considers the diligent efforts of the defendant and its counsel in investigating and evaluating the claim, in keeping the insured and his attorney informed at every stage and finally in offering to plaintiff's counsel the policy limit of $50,000 only a week after the offer was made and a full three weeks before trial, there can certainly be no serious contention that the insurer in this case acted in bad faith just because the offer may have been made a few minutes after the so-called "deadline" arbitrarily imposed by plaintiff's counsel.

In a more recent case the Louisiana Court of Appeal, Third Circuit, considered another claim for an excess judgment. The opinion in Wooten v. Central Mutual Insurance Company, 166 So.2d 747 (La.App. 3rd Cir., 1964) was written by Judge Tate of that court and contains a good discussion of Louisiana Jurisprudence respecting claims for excess judgments against the insurer. In the course of that opinion the Court said:

"Only three Louisiana cases have touched upon the question, and they have indicated that an insurer may be held liable in excess of its policy limits where the insurer's failure to settle is not in good faith and is arbitrary under the circumstances. New Orleans & C. R. Co. v. Maryland Casualty Co., 114 La. 153, 38 So. 89 (1905); Stewart v. Wood, La.App. 1 Cir., 153 So.2d 497 (1963); Davis v. Maryland Casualty Co., 2 Cir., 16 La. App. 253, 133 So. 769 (1931)."

The Louisiana Supreme Court considered an excess claim against an insurer in Roberie v. Southern Farm Bureau Casualty Insurance Company, 250 La. 105, 194 So.2d 713 (1967). That suit is a sequel to Pitre v. Roberie, La.App., 117 So.2d 74 in which plaintiff obtained judgment for some $28,000 against Roberie and his insurer which judgment exceeded by $8,000 Roberie's policy limits. Thereafter, the insured settled with the plaintiffs for $7,000 and sued his insurer for its failure to settle within the policy limits. In permitting Roberie to recover this amount from his insurer, the Supreme Court stated:

"We agree with the Court of Appeal that there was no bad faith on the part of the Insurance Company in not compromising the claims filed against it in the Pitre case. It acted within the terms of its insurance contract in proceeding to trial, and, under the facts supra, its actions could not be considered arbitrary, i. e., it preferred litigation to compromise. *However, the insured, Roberie, was kept in the dark; he was never appraised of the offers of compromise nor warned of his potential liabilities; he was ignored.* He needed information and advice on the point of his potential liability, which he was not given by his representative, his insurer. A conflict of interest arose between the insurer and the insured. The insurer failed to discharge its duty toward its insured, thereby precluding any decisive action on his part. *We find that the actions of Southern Farm Bureau Casualty Insurance Company towards Roberie were more than negligent; they were in bad faith and in utter disregard of Roberie's natural desire to protect himself from financial loss.* (Citing many cases)

From the foregoing reference to the Louisiana Supreme Court decision in *Roberie* it is clear that the simple issue in a case in which an excess judgment claim is made by the insured against his insurer is whether the insurer acted in good or in bad faith in handling the matter. In *Roberie,* while the Court concluded that the defense of the claim was handled well, nevertheless bad faith was shown because the insurer failed to advise the insured of his potential liability beyond the policy limits. This is certainly not our case. Mr. Bailey was informed of the progress of the litigation at all times either directly or through his attorney of record, Mr. Evans. When the $50,000 settlement au-

thority was received, that fact was communicated to Mr. Evans.

In Younger v. Lumbermen's Mutual Casualty Company, 174 So.2d 672 (La. App. 3rd Cir. 1965) a claim for an excess judgment was made against the insurer of a driver who struck a small child in an accident. After considering the various factors, including insured's adamant and repeated statements that the child darted out in front of her car, the Court referred to Insurance Law and Practice, Appleman, and stated:

"Again, the treatise summarizes the standard of the insurer's duty as follows, Section 4712 at p. 562: "Some courts, in weighing the responsibilities of the liability insurer, speak of bad faith; some speak of negligence; others use the two terms interchangeably. And, in truth, they are to some extent interchangeable. The insurer, as a professional defender of lawsuits, is held to a standard higher than that of an unskilled practitioner. What might be ignorance in his instance may be unforgivable oversight of the insurer; what might be neglect in his instance could well constitute bad faith on the part of the insurer. The question is always: 'Did the insurer exercise that degree of skill, judgment, and consideration for the welfare of the insured which it, as a skilled professional defender of lawsuits having sole charge of the investigation, settlement, and trial of the suit may have been expected to utilize?' If it did, there is no problem; it is not liable. If it did not, then a court could easily describe its conduct as being negligent, or as not in accordance with the high duty of good faith which it owed to its insured.

"Considering all of the circumstances in this case, we are unable to say the insurer's failure to keep its insured informed of an offer to compromise within policy limits, even where the insured was clearly exposed to liability in excess of the policy limits, amounted to a breach of duty such as

to justify a holding of the insurer's bad faith."

Regardless of whether the test is "negligence" or "bad faith" it is readily apparent from a review of the undisputed facts that defendant certainly exercised that "* * * degree of skill, judgment and consideration for the welfare of the insured * * *" that it should have exercised.

■ On the basis of the Louisiana jurisprudence, a prerequisite to proving a claim for an excess judgment against one's insurer is that the insurer failed to accept an offer to settle within its policy limits and that such a failure was negligent, arbitrary and/or in bad faith. In the case at bar there was neither negligence, bad faith nor arbitrary action. A complete and full tender of the $50,000 policy limits was made only minutes after the 5:00 P.M. "deadline" on October 16th and a formal tender, including the transmittal of a draft and settlement papers, was made on October 29, 1968. Repeated attempts were made to achieve settlement for the policy limits of $50,000, all of which were summarily refused by plaintiff.

Judgment for defendant.